## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

FELICIA KOCH, *et al.*,                    )
                                           )
                    Plaintiffs,            )
vs.                                        )          NO.  CIV-13-0750-HE
                                           )
DAVID JUBER, *et al.*,                     )
                                           )
                    Defendants.            )

## ORDER

Plaintiffs[1] filed this § 1983 action against the Oklahoma Department of Corrections

and various guards and officials of the the Mabel Bassett Correctional Center ("MBCC"),

which is located in McLoud, Oklahoma.  The claims against the Department of Corrections

and some of the individual defendants have been resolved,[2] leaving only the claims against

Millicent Newton-Embry ("Newton-Embry"), Carla King, and Jamie Baker for resolution.

At the time of the actions that underlie plaintiffs' claims, plaintiffs were inmates at

MBCC.  Defendant Newton-Embry was the Warden at MBCC and King was the Deputy

Warden.  Baker was a guard at the facility.

Plaintiffs assert claims against these defendants for violations of their Eighth and

---

[1]*Felicia Koch, Amber Blevins, Ashley Bolding, Candice Buchanan, Stacy Dimas-Olson, Nichole Estes, Jessica James, Melissa Nelson, Heather Weber, Elly Wright and Carmile Sulvetta, were the original plaintiffs. Felicia Koch's claims have since been dismissed with prejudice and Carmile Sulvetta's claims were dismissed without prejudice.  See Doc. Nos. 48, 59.  Koch was the only plaintiff who alleged she was assaulted by Juber.*

[2]*The parties stipulated to the dismissal without prejudice of plaintiffs' claims against defendants Dildine and Juber.  Doc. #110.  Plaintiffs' claims against the DOC were dismissed with prejudice.  See Doc. #52.*

Fourteenth Amendment rights under 42 U.S.C. § 1983.[3] They also assert claims under state law against defendant Baker. The claims against Newton-Embry and King are asserted against them in their individual capacities. Defendants Newton-Embry and King have moved for summary judgment, asserting the defenses of qualified immunity and failure to exhaust administrative remedies.[4]

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A genuine dispute as to a material fact 'exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1141 (10th Cir. 2011) (quoting Zwygart v. Bd. of Cnty. Comm'rs, 483 F.3d 1086, 1090 (10th Cir.2007)).

The defense of qualified immunity "'protects government officials 'from liability for

---

[3]In their response brief, plaintiffs refer to a substantive due process claim asserted under the Fifth and Fourteenth Amendments. See Doc. #176, at p. 43 & n.6. Plaintiffs did not allege such a claim in their Third Amended Complaint and cannot amend their complaint in a brief or at this late stage of the proceedings without leave of court. Defendants also challenge the attempted amendment. See Doc. #181, p. 9 n.4.

[4]The court must consider defendants' exhaustion defense first because, if plaintiffs did not exhaust their administrative remedies, they are barred by the Prison Litigation Reform Act from pursuing their § 1983 claims. 42 U.S.C. § 1997e(a). The defense merits little discussion. Plaintiffs did file incident/staff reports, which defendants referred for criminal prosecution. There is no evidence defendants rejected or returned the reports for noncompliance with the grievance process or otherwise informed plaintiffs of problems with their grievances. See Doc. #163-49, p. 9, §VI (B)(6). Although defendants filed motions to dismiss, they did not seek dismissal on the basis of failure to exhaust. Under these combined circumstances, the court concludes defendants have waived their defense of non-exhaustion. This conclusion moots plaintiffs' motion to strike [Doc. #172].

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dodds v. Richardson, 614 F.3d 1185, 1191 (10th Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Once the defense is raised, the plaintiffs "bear[] the burden of satisfying a 'strict two-part test.'" *Id.* (quoting McBeth v. Himes, 598 F.3d 708, 716 (10th Cir.2010)). They "'must establish (1) that the defendant[s] violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant[s'] conduct....'" *Id.* (quoting McBeth, 598 F.3d at 716). "'If, and only if, the plaintiff[s] meet[] this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" Koch v. City of Del City, 660 F.3d 1228, 1238 (10th Cir. 2011) (quoting Clark v. Edmunds, 513 F.3d 1219, 1222 (10th Cir.2008)).

Applying these standards, the court concludes defendants' motion should be granted.[5]

<u>Background</u>

As noted above, plaintiffs are current and former inmates at MBCC. They allege they were sexually assaulted by defendant Baker, formerly a guard at the facility, over a period of several months during 2012. Baker was charged with multiple criminal offenses arising out of these circumstances and pled guilty to raping, sodomizing or sexually assaulting eight

---

[5]*Page references for briefs and exhibits are to the CM/ECF document and page number.*

of the plaintiffs.[6]  He is now incarcerated based on the resulting convictions.

Plaintiffs allege the defendants violated their rights by subjecting them to cruel and unusual punishment in violation of the Eighth Amendment.  Specifically, plaintiffs claim Baker violated their right to be free from sexual assault while incarcerated and that Newton-Embry and King, as the warden and deputy warden of MBCC, are accountable for Baker's behavior because their deliberate indifference led to or permitted the violations by Baker.  They allege that this deliberate indifference is shown by four general categories of facts and circumstances: (1) failure to conduct, or insist on, a proper background investigation of Baker before he was hired, (2) failure to respond appropriately when they later learned of earlier instances of sexual misconduct by Baker, (3) failure to properly address staffing deficiencies at MBCC, and (4) failure to deal appropriately with the placement and maintenance of surveillance cameras at MBCC.[7] The pertinent undisputed facts or evidentiary submissions are discussed in connection with each of these areas.

<u>Analysis</u>

It is undisputed that defendants Newton-Embry and King did not participate in or authorize the conduct of defendant Baker that is the basis for plaintiffs' claims.[8]  They were,

_____

[6]*Baker was not charged with a crime with respect to the remaining plaintiff, Elly Wright, but she testified that he sexually assaulted her.  Doc. #176-32, pp. 1-3.*

[7]*Plaintiffs also make passing reference to defendants' failure to respond appropriately to problems with the sprinkler system, but make no effort to link those problems to what happened to plaintiffs.*

[8]*Indeed, it is close to undisputed that no basis for plaintiffs' claims exists against Deputy Warden King at all.  Virtually all of plaintiffs' evidence and argument is directed to Warden Newton-Embry, not King.*

however, his supervisors and plaintiffs' claims are based on what is sometimes referred to as "supervisory liability." The Supreme Court has suggested that the term is a "misnomer" because it implies that supervisors are vicariously liable for the acts of their subordinates, and they are not. Section 1983 does not authorize liability under a theory of respondeat superior. Ashcroft v. Iqbal, 556 U. S. 662, 677 (2009). Rather, a supervisor will be "liable only for his or her own misconduct." *Id.* A plaintiff must therefore show an "affirmative link" between the supervisor and the underlying constitutional violation. Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013). The affirmative link requirement has "'three related prongs: (1) personal involvement; (2) sufficient causal connection, and (3) culpable state of mind.'" *Id.* (quoting Dodds, 614 F.3d at 1195).

Defendants focus primarily on the third element in suggesting they did not violate plaintiffs' constitutional rights. The applicable state-of-mind standard varies depending on the nature of the alleged constitutional violation. Where, as here, the alleged violation is of the Eighth Amendment, a prison official "may be held liable . . . only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994); Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003) ("The [Supreme] Court defined this 'deliberate indifference' standard as equal to 'recklessness,' in which 'a person disregards a risk of harm of which he is aware.') (quoting Farmer, 511 U.S. at 836-37).

> The test for a "deliberate indifference" claim under the Eighth Amendment has both an objective and a subjective component. The objective component of the test is met if the harm suffered is sufficiently serious to implicate the cruel and

unusual punishment clause. The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety.

Kikumura v. Osagie, 461 F.3d 1269, 1291 (10th Cir.2006) (citations omitted), *overruled on other grounds* by Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir.2008). Deliberate indifference is "a stringent standard of fault. A showing of simple or even heightened negligence will not suffice." Castillo v. Day, 790 F.3d 1013, 1021 (10th Cir. 2015) (quoting Giron v. Corr. Corp. of America, 191 F.3d 1281, 1286 (10th Cir. 1999)).

Defendants acknowledge that "'an inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards.'" Castillo v. Day, 790 F.3d 1013, 1018 (10th Cir. 2015) (quoting Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir.1993)). They therefore concede that plaintiffs' allegations of rape or sexual assault satisfy the objective component of the "deliberate indifference" standard.[9]

"To prevail on the subjective component, the prisoner must show that the defendant[] knew [the prisoner] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Id.* at 1021 (internal quotation marks omitted). The official must "actually be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir.2008) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). As explained by the Supreme Court, "'deliberate indifference entails something

---

[9]*Defendants stipulated that Baker pleaded guilty to raping, sodomizing or sexually assaulting eight plaintiffs, but would not "agree that Baker was actually guilty of such charges." Doc. #176-31, p. 7.*

more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result.'" Verdecia, 327 F.3d at 1175 (quoting Farmer, 511 U.S. at 835). Regardless of how obvious the risk is or how grossly negligent the official is in failing to perceive it, "[a]n official's failure to alleviate a significant risk of which [s]he was unaware . . . is not an infliction of punishment and therefore not a constitutional violation." Tafoya, 516 F.3d at 916. "'[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if [s]he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" Castillo, 790 F.3d at 1019 (quoting Farmer, 511 U.S. at 847).

The question thus becomes whether plaintiffs have submitted evidence sufficient to create a justiciable question as to whether defendants had the "culpable state of mind" necessary to a finding of deliberate indifference. See Tafoya, 516 F.3d at 916.

 Deliberate indifference in this context is commonly shown by evidence that the supervisory official had notice of prior incidents of misconduct by the assailant, or of prior similar incidents at the facility, and failed to respond appropriately to those incidents. *E.g.,* Gonzales v. Martinez, 403 F.3d 1179 (10th Cir. 2005). Here, there is no evidence that Baker had prior incidents of misconduct while employed at MBCC nor is there any indication that allegations of sexual misconduct by other staff, or of inmate on inmate sexual conduct, were

handled inappropriately by Newton-Embry or King.[10]   Further, it is undisputed that once

Newton-Embry and King learned of the allegations against Baker by inmate Nelson, they

responded promptly.  Newton-Embry immediately had plaintiff Nelson examined by medical

staff and put Baker on leave.  She contacted Internal Affairs and an investigation commenced

promptly.[11]   In addition, there is other undisputed evidence of Newton-Embry's attention to

the risk of these sorts of harm to inmates.  The various requirements and standards of the

Prison Rape Elimination Act ("PREA") were discussed at senior staff meetings and were the

subject of training for all staff, including Baker.  It is undisputed that Baker received training

on PREA policies and sexual harassment prohibitions from Newton-Embry herself, in an

orientation class she conducted.

Lacking evidence of the more common indicators of management indifference,

plaintiffs rely, as noted above, on activities or circumstances in four general areas as showing

Newton-Embry's and King's deliberate indifference.

### i. Adequacy of the background investigation

Plaintiffs contend defendants' deliberate indifference is shown by their failure to insist

on a more detailed or thorough background investigation of Baker.  They argue a proper

background investigation would have revealed discipline he received in 2007 from the

---

[10]*See defendants' undisputed facts 10-16 [Doc. #164, pp. 5-6].*

[11]*Plaintiffs challenge whether the investigator moved swiftly enough in completing the investigation, but do not dispute that Newton-Embry's initiation of it was prompt.*

Oklahoma Board of Nursing,[12] or his alleged prior misconduct while employed at Integris. However, the adequacy of the investigation must be evaluated, for present purposes, based on what defendants knew at the time, not what is now known based on 20/20 hindsight. There is little in plaintiffs' submissions which supports an inference that the background investigation was deficient in any way, and nothing in those submissions which suggests the investigation was so deficient that defendants should have noted the deficiency and insisted on something else. It is undisputed that a background investigation was in fact conducted. Baker submitted the necessary paperwork for employment and included support letters from his pastor and others attesting to his good character. The personal references provided by Baker were contacted; those responding provided positive references.[13] Prior employers were contacted. All verified his employment.[14]

Additional steps beyond the normal background investigation were taken. It is undisputed that Newton-Embry personally contacted Baker's former DOC employer and was advised that he was "a good hand." Because Baker had previously been employed by the DOC itself, approval of his re-employment from higher authorities in DOC was necessary. Apparently as part of that "higher up" approval, Deputy DOC Director Pitman reviewed the

---

[12]*The Oklahoma Board of Nursing disciplined Baker in 2007 based on allegations of sexual misconduct. He was placed on probation and required to submit to a psychiatric evaluation.*

[13]*One was apparently out of the country. It is unclear whether that person actually provided input.*

[14]*At least two prior employers declined to provide more information than to confirm his employment, citing company confidentiality policies. One of the prior employers indicated he would be considered for rehire, and none indicated the contrary.*

Oklahoma Board of Nursing's web site and it showed that Baker's nursing license was in good status and that it "had no restrictions." Doc. #164-20, p. 7. The Nursing Board's web site, when Deputy Director Pitman accessed it, did not reflect discipline imposed prior to January 2009, *see* Doc. #163-42, ¶¶4-5, and plaintiffs do not argue that it put defendants on notice that Baker had been disciplined previously.

While the fact that Baker was pursuing a lesser paying correctional officer position rather than a job as a nurse might have aroused suspicion, he offered a plausible explanation for his decision not to continue his career in nursing – he had previously worked at Oklahoma State Penitentiary, regretted leaving there and wanted to "work his way up the system to being a deputy or a warden." Doc. # 176-14, pp. 4-5.

In short, there is nothing in these submissions which supports an inference that defendants were deliberately indifferent due to their participation in, or reliance on, the background investigation done as to Baker or the decision to hire him.

*ii. The response to Wick's information.*

In June of 2012, Debra Wick was hired in the food service operation at MBCC. Ms. Wick encountered Baker, learned that he was employed at MBCC and told Deputy Warden King about Baker's prior sexual misconduct at Integris. Plaintiffs fault defendants for doing nothing, or not doing enough, when they received Wick's report that he was a sexual predator, and assert they did nothing other than "send[] a letter up the chain of command." Doc. #176, p. 51. They also contend that Baker's "lie" on his employment application about the absence of prior complaints, combined with his "abandonment of a career in nursing for

a job as a correctional officer in a women's prison" warranted further investigation.  *Id.*

It is undisputed that King immediately reported the Wick contact to Newton-Embry. It is also undisputed that Newton-Embry immediately directed King to get a more complete report from Wick as to Baker's past conduct, that King did so, and that Newton-Embry began making calls based on the report.  It is undisputed that Wick informed King and put in the incident report she prepared for Newton-Embry that Integris personnel concluded the prior allegations against Baker were unsubstantiated.  It is also undisputed that Newton-Embry contacted the DOC's civil rights administrator, who was responsible for civil rights violations and sexual harassment, and was told that nothing could be done because the allegations were unsubstantiated.  Newton-Embry relayed this information to her superior, Deputy Director Pitman, in a memo, noting the administrator's view that because the alleged conduct did not occur at DOC "we can only monitor the staff."   It is similarly undisputed that she contacted the DOC legal department and inquired if the circumstances were grounds for Baker's termination.  She was advised that he could not be discharged based on information from an employee that is unsubstantiated.  She asked the legal department whether she could appropriately contact Baker about the allegations, was apparently told she could, and promptly did so.  She advised Baker of the allegations about his conduct at Integris, which he denied.  She reminded him that he was now working in a facility for female inmates, reminded him of the sexual harassment policy she discussed with him in the new employee orientation, and of the expectations for his behavior with staff and offenders.

With 20/20 hindsight, it would certainly have been desirable if defendants or others

had reopened or conducted a more searching examination of Baker's background and there is reason to argue with the advice that Newton-Embry got from legal or others (i.e., all we can do is "monitor"). But it is undisputed that is the advice she got and that, coupled with the others steps she took, is plainly inconsistent with a finding of deliberate indifference on Newton-Embry's part.[15]

This conclusion is bolstered by <u>Schneider</u>, 717 F.3d at 760, a case involving a rape committed by a Grand Junction Police Department("GJPD") police officer, Glenn Coyne. The victim sued Coyne's supervisors and the GJPD police department under 42 U.S.C. §1983, alleging a violation of her substantive due process right to bodily integrity. She claimed, among other things, that Coyne had been inadequately disciplined approximately nine months previously for a sexual assault involving V.W. Coyne and V.W. initially engaged in consensual sex, but he "allegedly took the encounter beyond her consent and sexually assaulted her." *Id*. at 765. After a criminal investigation, the district attorney declined to bring charges because the evidence was equivocal. V.W. admitted the encounter began consensually, the medical evidence was inconclusive and Coyne had passed a polygraph to the effect that all the activities were consensual. An internal investigation also determined that proof of sexual assault was inconclusive. Rather than terminate Coyne, the police chief placed him on probation for at least six months, issued him a written notice of

---

[15]*There is nothing in these circumstances that even hints at deliberate indifference on the part of King. She immediately reported Wick's information to the Warden and got the followup report as directed.*

discipline and cut his pay.

In rejecting the plaintiff's claim that the police chief's disciplinary decision reflected deliberate indifference, the Tenth Circuit stated: "It is only in hindsight, with knowledge of the assaults on Ms. Schneider and A.L., that the scales may have tipped in favor of V.W.'s version of events. Whether Chief Gardner acted with deliberate indifference must be based on what he knew then, not what is known now." *Id.* at 776.

The same is true of the defendants here. Their actions must be judged based on what they knew in 2012, not what is known now.

In short, there is no basis in the evidence as to defendants' reactions to Wick's report that would support an inference of deliberate indifference.

### iii. *Failure to address staffing deficiencies*

Plaintiffs argue that "Newton-Embry knew for years that MBCC was chronically understaffed, that she was responsible for the understaffing, and that understaffing placed inmates at risk." Doc. #176, p. 57. In so arguing, they rely almost entirely on the impact of a disciplinary suspension of defendant Newton-Embry in June 2012 which was based, in part, on her handling of staffing issues.

The evidence indicates that, beginning in June 2011, Deputy Director Laura Pitman sent a series of memos to Newton-Embry related to vacant correctional officer positions at MBCC. Principally because of unfilled positions, MBCC had incurred over 3000 hours of overtime in March 2011. *See* Doc. #176-8. Pitman directed Newton-Embry to focus on filling the vacant positions. The next month Pitman provided Newton-Embry with a list of

positions, which included 27 correctional officer positions that had been approved but not filled. Pitman told Newton-Embry she expected her to be "actively involved" in filling the positions. Doc. #176-5. The following December Pitman sent Newton-Embry another memo concerning unacceptable overtime. Although Newton-Embry had submitted a plan on November 15, 2011, to ensure officers did not work more than 120 or more hours of overtime per pay period, there had been a significant increase in the number of officers working overtime. Newton-Embry was again advised she was responsible for maintaining adequate staffing.

As of March 2012, overtime issues persisted. Pitman informed Edward Evans, the Associate Director, that Newton-Embry would be informed that she was "solely responsible for overtime accrued in excess of the 120 hours and she should take whatever steps are necessary to ensure this does not occur." Doc. #176-37.

The staffing issues continued. As of April 30, 2012, only 52.2% of the authorized correctional officer positions were filled at MBCC,[16] compared with 63.3% and 71.7% at what Pitman viewed as comparable facilities. Doc. #164-24. In May 2012, Pitman wrote Newton-Embry that "[a] review of the facility's progress in filling the vacant chief of security and four captain positions is distressing." Doc. #176-11. The deputy director was told that it was "essential that hiring process be a top priority," because "existing staff need the relief and assistance of new staff." *Id.* She was told to make weekly progress reports and

---

[16]*Defendants challenge this percentage, see Doc. Nos. 164, p. 47 n.11, 181 p. 6, ¶28, but the court accepts it for summary judgment purposes.*

complete the selection process for the vacant chief of security and four captain positions by June 19, 2012.

On June 15, 2012, Newton-Embry was suspended for five days without pay because of her failure to fill staffing shortages, failure to ensure no officers worked in excess of 120 hours overtime (in both April and May 2012 correctional officers had again exceeded the 120 hour overtime limit), and other issues not material to plaintiffs' claims. Doc. #164-24.

Plaintiffs argue that the Pitman memo and the related discipline is evidence of deliberate indifference to staffing issues on Newton-Embry's part. The court concludes otherwise.

It is undisputed that staffing was a significant problem at MBCC during the relevant time period, as it was for the entire DOC. It is undisputed that, from at least 2009 on, the DOC went through exceptional financial difficulties including substantial reductions in budget, hiring freezes, furloughs of employees, early buy-outs of employees, and the like, against the backdrop of generally low pay for guards and other employees.[17] It is unclear whether, or to what extent, the financial circumstances improved by 2012, the time frame most pertinent here, but it is at least clear that senior DOC personnel decided it was up to Newton-Embry to fix the staffing problem. And it is undisputed that she made efforts to do so. Advertisements were placed for the various positions. Newton-Embry posted fliers with local businesses, attended job fairs, spoke with local chambers of commerce and other such

---

[17]*There is some evidence, albeit disputed, that hiring for MBCC involved additional challenges due to its location and its status as a prison for women.*

groups, and contacted other groups in the area.[18]  She encouraged staff to contact family and friends who were potential applicants.  She began sitting in on hiring committee interviews of prospective applicants in an effort to expedite the hiring process and began interviewing applicants outside normal business hours to accommodate their schedules.  She apparently did not have a formal "action plan" to solve the staffing problem, but did nonetheless undertake substantial efforts to address the issue.

So, given the undisputed facts as to Newton-Embry's staffing efforts, what inference applicable to this case could a fact-finder reasonably draw from the Pitman suspension memo?  More to the point, does the suspension memo, in these circumstances, support an inference of "deliberate indifference" on the part of Newton-Embry?  The court concludes it does not.  It is plain that Dr. Pitman believed Newton-Embry was not doing enough to solve the staffing problem.   But it is also undisputed that Newton-Embry was trying to address the problem.  It may well be that Newton-Embry was not an effective manager where the management of overtime was concerned.   It may be that her hiring efforts were inadequate or substandard in some respects, or that she was negligent in the way she went about addressing the problem.   But that does not support an inference that she was "deliberately indifferent" to the staffing problem or to the potential consequences of it.

---

[18]*Plaintiffs dispute this on the basis it is supported only by Newton-Embry's "self-serving" affidavit.  The "self-serving" description is no doubt a basis to discount an affidavit in some circumstances, such as where no contrary evidence is really possible (e.g., "What I thought was ....").  That is not the case here, where the affidavit addresses objective facts that are subject to verification.  There is no flat rule that a party cannot submit an affidavit as to factual matters just because the affidavit supports (i.e., "serves") the party's position.*

Beyond the impact of the "deliberate indifference" standard, the court concludes plaintiff's submissions are also insufficient to create a justiciable issue as to whether the referenced staffing deficiencies actually translated into the harm suffered by plaintiffs here. That is because plaintiffs have not offered any evidence that, at any point relevant to a particular incident between Baker and a plaintiff, MBCC was operating without adequate staff. In some respects, the suspension memo suggests the opposite. Part of the reason Newton-Embry was disciplined was because of the overtime costs being generated at MBCC. This suggests Newton-Embry was covering the various shifts and responsibilities at MBCC by extensive---perhaps too extensive---use of overtime, but it does not necessarily support an inference that some oversight or other function was not performed by reason of it. Plaintiffs make no showing that any particular incident occurred because other officers were not around.

The cases plaintiffs rely on do not suggest a contrary conclusion. In <u>Van Riper v. Wexford Health Sources, Inc.</u>, 67 Fed. Appx. 501 (10th Cir. 2003), the plaintiff relied on "<u>unchallenged allegations</u> that (1) the assault against him arose at least in part out of conditions of understaffing, (2) there had been twenty-nine prior assaults at the facility also due in part to understaffing, and (3) defendants Uphoff and Everett were aware of understaffing problem because they had received a DOJ report highlighting this issue." *Id.* at 505 (emphasis added).

The Tenth Circuit concluded in <u>Lopez v. LeMaster</u>, 172 F.3d 756 (10th Cir. 1999), that the sheriff "was on notice of the danger." *Id.* at 762. <u>Lopez</u> involved a prisoner assault

in a county jail in October, 1997. A former jailer testified that the jail was "woefully understaffed" and "he was often the only jailer on duty." *Id*. at 761. A father had informed the Sheriff that his son had been assaulted at the jail in January 1997. He stated he was told "the jailers could do nothing to prevent attacks at the jail, and that jail personnel told him they would assign other inmates to protect his son." *Id.*

Poore involved the alleged sexual assault of a female juvenile inmate by a male detention officer at the Tulsa County Jail. Juvenile female inmates were held in individual cells in a wing of the jail's medical unit. Although the sheriff's staffing policy was to "require that at least two detention officers be assigned to the medical unit at all times, . . . during the time-frame of Poore's incarceration at the Jail, the medical unit was frequently single staffed." Poore, 46 F.Supp.3d at 1197. The Sheriff in Poore "acknowledged that a detention officer's 'best opportunity' to do inappropriate acts with the juvenile female inmates would be when assigned to the medical unit alone," yet "the busy medical unit was often single-staffed by a male detention officer and no cameras were installed to monitor access to the cells occupied by the juvenile females." Poore, 46 F.Supp.3d at 1203. There also had been a prior "documented report of a male Jail staff member watching a 15 year old female showering in the medical unit," yet the sheriff "could not identify any changes that were made with respect to the supervision of juvenile females at the Jail." *Id.*

Plaintiffs' expert states that "[o]perating at this staffing level, Mabel Basset was operating at a crisis level." Doc. #176-36,§ IX, ¶5. And in her letter suspending Newton-Embry, Pitman states that "[c]ontinued disregard of this [overtime] limit results in fatigued

staff and increased risk exposure." Doc. #164-24. Nonetheless, plaintiffs have not come forth with any evidence that, because positions were not filled, shifts were short staffed or that, because of fatigue, correctional officers were sleeping on the job or otherwise unable to prevent Baker's actions.

For these reasons, the court concludes plaintiffs' submissions as to the staffing issue are insufficient to create a justiciable issue as to whether defendants were deliberately indifferent to the circumstances and risks to plaintiffs.

#### iv. Cameras and blind spots

Plaintiffs asserts that defendants were deliberately indifferent based on their failure to install a sufficient number of security cameras or to maintain those which were installed. The court is unpersuaded the circumstances as to cameras support an inference of deliberate indifference. It is undisputed that MBCC was originally built as a private prison and that, when Newton-Embry arrived there as warden in 2004, it had no security cameras at all. It is also undisputed that she sought and received funding to install cameras soon thereafter. By 2012, when the circumstances at issue here arose, the facility had approximately 92 cameras. Plaintiffs assert there were not enough, apparently because they did not cover all the potential locations where misconduct might occur. But there is no suggestion in the cases (or otherwise in this record) that a correctional facility must have cameras trained on all parts of the facility, particularly those where staff, as opposed to other inmates, ordinarily are.[19]

_____

[19]*Although the court has not determined where each sexual attack occurred, several apparently did take place in the guards' bathroom. Doc. #176-28; 176-40, p. 1. The submissions*

*See* Lopez, 172 F.3d at 759 ("[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners."). Further, it is undisputed that Newton-Embry was required to get higher approval and to access central DOC funds to add security cameras, and that she had done so as recently as April 2012. It appears the April request included at least one of the locations (the breezeway at the CI housing unit) which plaintiffs suggest was a "blind spot." Given the undisputed evidence as to Newton-Embry's efforts, there is no basis in the evidence for an inference that she was deliberately indifferent based on a failure to acquire or seek additional cameras.

Plaintiffs also assert defendants were deliberately indifferent based on their failure to insist on regular operating reports as to the cameras and to deal with their maintenance. However, the evidence submitted suggests the missing inoperable equipment reports were relatively rare,[20] and, in any event, plaintiffs' evidence does not purport to link any particular assault with cameras, operable or otherwise, in the area where it occurred.

In sum, against the backdrop of no prior instances of guard misconduct which might have alerted defendants to the need for additional cameras in areas where the guards were, plaintiffs' submissions are insufficient to create a justiciable question as to whether defendants were deliberately indifferent based on equipment maintenance.

To the extent that plaintiffs rely on the opinions of their expert, Ron McAndrew, in

---

also suggest some of the assaults were in a broom closet.

[20]Deputy Warden King, whose testimony plaintiffs rely on, indicated is was "possible" that regular weekly reports were not being filled out. Defendants also offered evidence that staff failed only twice during the pertinent time frame to turn in the reports. Doc. #181, p. 7, ¶44.

support of their arguments as to defendants' alleged deliberate indifference, the court has substantially limited the scope of his opinions by separate order. Those limitations prevent testimony by Mr. McAndrew to the effect that Newton-Embry's conduct and leadership of the institution led to "systemic failure" which, in turn, resulted in the rapes or other sexual misconduct. Absent more than has been shown here, such "systemic failure" arguments are tantamount to basing supervisor liability on a theory of respondeat superior — a standard which is inapplicable to claims like those of plaintiffs.

In sum, the court concludes plaintiffs have not established that a material fact dispute exists with respect to whether defendants were deliberately indifferent to a known substantial risk of serious harm to plaintiffs. As they failed to establish the violation of a constitutional right, defendants are entitled to qualified immunity. Having reached this conclusion, it is unnecessary to determine whether qualified immunity might also be applicable on the basis the pertinent right was not clearly established.

This case presents difficult facts. What happened to plaintiffs should not have occurred, regardless of whether the particular sexual incidents are determined to be consensual or not. Plaintiffs' desire for someone to pay for what Baker did to them — beyond Baker's incarceration — is understandable. But under the circumstances reflected by the parties' submissions here, the law does not impose liability on the otherwise innocent supervisors of the facility where the plaintiffs' rights were violated.

The motion for summary judgment of defendants Newton-Embry and King [Doc. #163] is **GRANTED**. Judgment will be entered in defendants' favor when the case is

concluded with respect to all claims and parties.  *See* Fed.R.Civ.P. 54(b).

This case is **STRICKEN** from the **July 2016**, trial docket.  This decision **MOOTS** plaintiffs' motion to take judicial notice of certain facts [Doc. #202], defendants' motion to depose inmate out of time [Doc. #205]; plaintiff Amber Blevins' motion to dismiss [Doc. #207]; defendants' motion to amend/correct exhibit list/witness list [Doc. #208] and motion for expedited response and ruling [Doc. #224], defendants' motion to make further inquiry of prospective jurors [Doc. #213], defendants' motion in limine [Doc. #209], plaintiffs' motions in limine [Doc. Nos. 216, 217, 218, and 222], and defendants' motion to amend/correct counter designation of deposition testimony [Doc. #223].

The parties are directed to confer and advise the court within **fourteen (14) days**, by an appropriate joint filing, what further steps are necessary or appropriate to resolve the claims against Baker.  They also are directed to meet and attempt to resolve plaintiffs' renewed motion to modify protective order [Doc. #199] and to advise the court in the joint filing of the results of their conference.

**IT IS SO ORDERED**.

Dated this 28th day of June, 2016.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE